[Cite as *Nix v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-2902.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Anthony Nix,                                  :

      Plaintiff-Appellant,           :

                                      No. 13AP-547

v.                                            :          (Ct. of Cl. No. 2011-11939)

Ohio Department of Rehabilitation &           :          (REGULAR CALENDAR)
Correction,

                                :

      Defendant-Appellee.            :

                                :

D E C I S I O N

Rendered on June 30, 2014

*Swope and Swope – Attorneys at Law*, **and** *Richard F. Swope*, **for appellant.**

*Michael DeWine*, Attorney General, and *James P. Dinsmore*, for appellee.

APPEAL from the Court of Claims of Ohio.

BROWN, J.

{¶ 1} This is an appeal by plaintiff-appellant, Anthony Nix, from a judgment of the Court of Claims of Ohio overruling his objections to a magistrate's decision and rendering judgment in favor of defendant-appellee, Ohio Department of Rehabilitation & Correction.

{¶ 2} At all times relevant, appellant was an inmate at the Mansfield Correctional Institution. On October 11, 2011, appellant filed a complaint alleging that two corrections officers at the facility assaulted him, causing injuries, extreme pain and suffering, and emotional distress.

{¶ 3} The Court of Claims assigned the matter to a magistrate who conducted a trial October 30, 2012. Appellant testified on his own behalf and gave the following account of the events at issue. In July 2011, appellant learned that another inmate, John Hodge, had stolen a "Pacman" video game belonging to appellant's cellmate. (Tr. 22.) On two separate occasions, appellant asked Hodge about the missing game.

{¶ 4} On July 9, 2011, appellant was near the "4-D" area of the facility when a corrections officer ("CO"), Joshua Garrett, pulled up in a cart and asked appellant: "[W]hat you got on your waist? Look like you got something on your waist." (Tr. 23.) Appellant denied having anything on his waist.

{¶ 5} CO Garrett told appellant to lift up his shirt. Appellant complied, and showed the officer he did not have anything on his waist. CO Garrett "grabbed my arm and told me to cuff up." The CO grabbed appellant's arm and "twisted it around." (Tr. 24.) At this time, another CO, Jerry Campbell, arrived in a cart and "maced" appellant in the face. (Tr. 24.) The officers "kept saying, cuff up, cuff up." (Tr. 24.) Appellant put his arms behind his back and lifted his arms "so they can cuff me." (Tr. 24.) CO Garrett then said, "oh, so you refusing to cuff up?" (Tr. 24.) Appellant responded, "cuff me up." (Tr. 24.) CO Garrett then "slammed me to the ground." (Tr. 25.) The officers were "acting like I was refusing to give the other one the arm, and they started macing me. Campbell started macing me in the face. Every time I'd turn my face, he just maced me." (Tr. 25.) COs Garrett and Campbell cuffed appellant and walked him to the infirmary. Once inside the infirmary, they "threw me into the water fountain, told me to get up." (Tr. 26.)

{¶ 6} Two other COs, "CO Ransom" and "CO Windom," as well as several nurses, were inside the infirmary at the time. (Tr. 29.) There was a desk in the infirmary, and "CO Windom and Ransom and two nurses were behind the desk." (Tr. 29.) Another inmate, Paul Bidwell, was also inside the infirmary.

{¶ 7} COs Garrett and Campbell then took appellant to the back of the infirmary and threw him on the ground. Appellant gave the following testimony regarding the ensuing events:

> They just started – that's when they started the assault. They started beating me, choking me. Campbell put a rubber glove on his hand and soaked the glove in mace and stuck it in my mouth. He kept macing the glove and he was rubbing it in my eyes and my nose. I was trying to get away. I was on the

> ground squirming.  Then he held me down and Garrett pulled my pants down and grabbed my penis and maced me in the penis.

(Tr. 27.)

{¶ 8}   The COs told appellant "that's what I get for trying to extort one of their porters."  (Tr. 27.)  CO Campbell "kept making me * * * say Pacman.  While he was macing me, he kept making me scream Pacman."  (Tr. 27-28.)

{¶ 9}   Shortly after the incident, appellant filed institutional complaints and several investigators contacted him regarding the incident.  Appellant declined to talk with the investigators at the time because his family lived in the area and he did not want to risk being transferred from the Mansfield facility.  (Tr. 32.)  Appellant later spoke with two investigators, Trevor Clark and Angela Hunsinger, and explained to them what happened.

{¶ 10} In July 2011, John Anthony Hodge was an inmate at the Mansfield Correctional Institution.  Hodge, who worked as a porter at the facility, testified that if anyone gave CO Campbell "problems, I'd take their property."  (Tr. 43-44.)  Hodge acknowledged stealing a Pacman video game.  When appellant later confronted Hodge about the video game, Hodge denied taking it.  Hodge then spoke with CO Clevenger, telling the CO that "this guy was bugging me about a video game system."  (Tr. 46.)  COs Garrett and Campbell then "pulled up on the golf cart, and Clevenger told them what I had told Clevenger."  (Tr. 46-47.)  COs Garrett and Campbell then "started coming up with a plan what they were going to do."  (Tr. 47.)  The officers planned to search appellant and make him turn around as if "he's posing a threat," and then "they were going to take him to the ground, mace him, take him back to the hole."  (Tr. 47.)

{¶ 11} On July 9, 2011, as appellant was leaving the food hall, Hodge observed CO Campbell approach appellant and spray mace in his face.  The CO took appellant to the ground, and several "[o]ther COs rushed over there."  (Tr. 49.)  The COs cuffed appellant and took him to the infirmary.   CO Campbell later told Hodge: "[W]e took care of this for you, * * * he was crying like a little bitch, we almost broke his arm, we made him say Pacman."  (Tr. 50.)

{¶ 12} Clark, staff counsel for appellee, investigated the incident. As part of his investigation, Clark interviewed appellant, who was initially hesitant to speak because he did not want to leave the Mansfield facility. According to Clark, appellant did not have any contraband at the time the COs confronted him, nor did they "take him to the hole for resisting." (Tr. 55.) Clark testified that appellant was honest regarding "the major details" of the incident. (Tr. 56.)

{¶ 13} During his investigation, Clark spoke with CO Ransom, who was on duty in the infirmary on the date of the incident. CO Ransom told Clark that "his only recollection was opening the door, and then from that point, he claims that he stayed out in the front area of the infirmary." (Tr. 59.)

{¶ 14} Clark interviewed CO Campbell as part of the investigation, and Clark "confronted him with the fact that 28 grams of mace was used from his canister." (Tr. 62.) CO Campbell "didn't really have a comment on that." (Tr. 63.) Clark interviewed CO Campbell a second time and the CO "broke down, crying, and indicated to me that he knew that they had screwed up." (Tr. 63.) CO Campbell "structured his explanation of the events to where his involvement was more restraining [appellant] while Garrett did the dirty work." (Tr. 63.) CO Campbell believed that "Garrett did, in fact, pull down [appellant's] pants and may have maced him in the anus and his genitalia." (Tr. 64.)

{¶ 15} Clark also spoke with CO Clevenger, who initially "said he had no knowledge of the incident whatsoever." (Tr. 68.) Later, Clevenger indicated he "saw Campbell standing up over top of [appellant], and that Garrett was holding him down on the ground, attempting to restrain him, but that he saw nothing unusual about the situation and turned and walked the other way." (Tr. 68.) CO Clevenger told Clark he did not smell mace.

{¶ 16} Clark interviewed a nurse, identified in Clark's report as "Nurse Moore," who was in a lunch break room in the infirmary at the time the officers arrived with appellant. Moore "claims that she came out to observe the commotion, and that Nurse Edgell confronted her and said, mind your own business. And then she went back in the break room and that was the end of her experience with it." (Tr. 73-74.) Clark interviewed "Nurse Edgell," who denied telling Moore to mind her own business. Clark interviewed a third nurse who did not recall anything about the incident.

{¶ 17} Clark also interviewed inmate Bidwell, who was in one of the infirmary cells at the time of the incident.  According to Clark, Bidwell related that he heard "shouts and screams" from appellant and that he also heard COs "shouting Pacman at him."  (Tr. 76.)

{¶ 18} Hunsinger, an institutional investigator at the Mansfield Correctional Institution, testified that there were no security cameras in the infirmary on the date of the incident.  Following the events, an inmate "blood spill crew" reported to the infirmary, and a report indicated the crew cleaned up some blood at the front of a holding cell.

{¶ 19} The magistrate issued a decision January 8, 2013, finding that COs Campbell and Garrett were not entitled to civil immunity based upon a determination that the COs acted with malicious purpose.  With respect to the issue of whether other employees in the infirmary at the time of the incident were negligent, the magistrate found that appellant "failed to establish that those employees breached their duty to 'provide for [plaintiff's] health, care, and well-being.' " The magistrate therefore recommended that the court render judgment in favor of appellee.  On February 6, 2013, appellant filed objections to the magistrate's decision.  By judgment entry filed May 21, 2013, the trial court overruled appellant's objections and rendered judgment in favor of appellee.

{¶ 20} On appeal, appellant sets forth the following four assignments of error for this court's review:

> ASSIGNMENT OF ERROR NO. 1:  THE MAGISTRATE AND THE COURT ERRED IN RULING C.O. CAMPBELL AND C.O. GARRETT WERE NOT ENTITLED TO IMMUNITY.
>
> ASSIGNMENT OF ERROR NO. 2:  THE MAGISTRATE AND THE COURT ERRED IN RULING DEFENDANT-[APPELLEE'S] EMPLOYEES WERE NOT AWARE OF CORRECTIONAL OFFICERS CAMPBELL'S AND GARRETT'S ASSAULTS IN THE INFIRMARY BASED ON THEIR CLEAR PROXIMITY TO THE EVENT, THE LEVEL OF NOISE, THE ACRID SMELL OF MACE AND THE OBVIOUS BLOOD INDICATING THE FEROCITY OF THE ATTACK.
>
> ASSIGNMENT OF ERROR NO. 3:   THE MAGISTRATE'S AND THE COURT'S DECISIONS AS TO BOTH ISSUES, IMMUNITY AND FAILURE TO PROTECT, ARE AGAINST

THE WEIGHT AND SUFFIICENCY OF THE EVIDENCE AND CONTRARY TO LAW.

ASSIGNMENT OF ERROR NO. 4: THE FAILURE TO JOIN GARRETT AND CAMPBELL AS PARTIES, ONCE THE DEFENDANTS-APPELLEES ASSERTED THEY WERE NOT ENTITLED TO IMMUNITY, OR TO NOTIFY THEM OF THE RIGHT TO OBJECT AND APPEAL, WAS ERROR.

{¶ 21} Appellant's first, second, and third assignments of error are interrelated and will be considered together. Under the first assignment of error, appellant asserts the trial court erred in ruling that COs Garrett and Campbell were not entitled to immunity, while his second assignment of error challenges the court's ruling that he failed to prove appellee's employees were aware of the assaults by COs Garrett and Campbell. In his third assignment of error, appellant contends the above determinations by the court were against the manifest weight of the evidence and contrary to law.

{¶ 22} We initially address appellant's contention that the trial court erred in holding that COs Garrett and Campbell were not entitled to civil immunity. In accordance with R.C. 2743.02(F), the Court of Claims "has exclusive jurisdiction to determine whether a state employee is immune from liability under R.C. 9.86." *Johns v. Univ. of Cincinnati Med. Assoc., Inc.,* 101 Ohio St.3d 234, 2004-Ohio-824, syllabus. R.C. 2743.02(F) states in part as follows:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.

{¶ 23} R.C. 9.86, which confers immunity on state officers and employees, provides in part as follows:

> [N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused

in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 24} In general, "[m]alicious purpose encompasses exercising 'malice,' which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State,* 136 Ohio App.3d 616, 620 (10th Dist.2000). Under Ohio law, "[a] person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. Port Clinton,* 37 Ohio St.3d 98, 99 (1988).

{¶ 25} In arguing that the trial court erred in ruling that COs Campbell and Garrett were not entitled to immunity, appellant contends that these COs were acting in accordance with R.C. 2921.44(C)(3), which states in part: "No law enforcement officer shall negligently * * * [f]ail to control an unruly prisoner." Specifically, appellant contends the COs took action to prevent him from intimidating or injuring Hodge.

{¶ 26} In the instant case, the magistrate, in considering the issue of immunity with respect to COs Garrett and Campbell, found that "while Garrett was initially privileged to stop and search [appellant] pursuant to his duties to maintain security * * * there was no evidence [appellant] thereafter disobeyed any orders or presented a threat of harm to himself or others." The magistrate found that "any use of force by Garrett and Campbell after the initial confrontation was unjustified, excessive, and constituted battery." The magistrate further determined that, "while Campbell and Garrett were acting within the scope of their employment * * * when they stopped and searched [appellant], they then acted with a 'malicious purpose' in that their only purpose in taking [appellant] into the infirmary was to punish him * * * by inflicting bodily injury upon him."

{¶ 27} In addressing appellant's objections to the magistrate's decision, the trial court agreed with the magistrate's determination that COs Garret and Campbell acted with malicious purpose. Specifically, the court held that the "sole purpose" for the attack by the COs was to punish appellant for his confrontations with Hodge. The court

determined that, "[w]hile Garrett initially searched plaintiff for contraband, he and Campbell then acted with a malicious purpose when they continued to beat [appellant] and spray him with Mace in the infirmary." The trial court additionally found that "Garrett and Campbell's conduct in maliciously assaulting [appellant] when there was no threat of violence or physical harm was manifestly outside the scope of their employment as COs."

{¶ 28} Upon review of the record, the evidence supports the trial court's finding that COs Campbell and Garrett maced and assaulted appellant, without provocation or justification, for the malicious purpose of causing him harm. According to the testimony presented, appellant did not have contraband at the time the COs approached him, and he made no efforts to resist the COs. The evidence also indicated that the COs were not acting out of a perceived threat by the inmate but, rather, were motivated by a desire to intimidate appellant for questioning a porter about a missing video game. Appellant testified that the COs sprayed him with mace "more than 10 times" during the incident. (Tr. 36.) According to appellant, the COs sprayed mace "in my face, in my penis, my anus, and [one of the COs] soaked his glove and stuck it in my mouth and stuck it in my nose and rubbed it in my eyes." (Tr. 36-37.) Appellee's investigator, Clark, confirmed that the COs discharged a significant amount of mace (28 grams) from the canister belonging to CO Campbell. Here, the trial court's findings that COs Garrett and Campbell acted with malicious purpose and that such conduct was outside the scope of their employment are not against the manifest weight of the evidence. Accordingly, we find no error with the trial court's determination that COs Garrett and Campbell are not entitled to civil immunity.

{¶ 29} We next address appellant's contention that the trial court erred in finding that he failed to prove, by a preponderance of the evidence, that appellee's employees knew of the assault by COs Garrett and Campbell. Specifically, appellant challenges the trial court's determination that he failed to establish that employees inside the infirmary at the time of the incident should have been aware of the assault by the two COs.

{¶ 30} In general, "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." *McDonald v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 02AP-735, 2013-Ohio-513, ¶ 8.

{¶ 31} In the instant case, the magistrate noted that Clark, as part of his investigation, had interviewed employees who were inside the infirmary on the date of the incident. The magistrate further noted Clark's testimony that "the other employees in the infirmary * * * informed him that they were unaware of the attack," but that Clark himself "was of the opinion that they should have been able to hear [appellant's] screams" and smell the administration of mace. The magistrate, however, found insufficient other evidence to establish that appellee's employees knew or should have known of the attack by COs Garrett and Campbell.

{¶ 32} In addressing appellant's objections to the magistrate's determination, the trial court held in part:

> Clark testified that other employees of [appellee] were in the infirmary at the time of the attack, including two COs and three nurses. When Clark questioned the two COs about the incident, they informed him that they did not see or hear the attack nor did they smell Mace. Clark testified that one nurse heard noise but she was told to mind her own business. None of these employees were called to testify at trial.
>
> [Appellant] contends that based on the size of the infirmary, the employees present in the area should have known that the attack was taking place. Upon review of the trial transcript, Clark's testimony as to the size of the infirmary was compared to the size of the room where the trial took place. Additionally, Clark testified that the infirmary has hallways and that one may not be able to see the entire infirmary from within it. Based on the record, the court is unable to determine the size of the infirmary and if employees would have seen the attack taking place.
>
> While [appellant] testified that he recalled COs Ran[s]om and Windom and nurses watching the attack in the infirmary, Clark testified that in the interviews he conducted, the COs and nurses said that they did not see the attack. This testimony is conflicting and as such, the court concludes that [appellant] has failed to prove by a preponderance of the evidence that [appellee's] employees in the infirmary knew the assault was occurring. * * *
>
> Furthermore, the court finds that [appellant] failed to prove by a preponderance of the evidence that [appellee's] employees knew or should have known about the assault based on the noise and the smell of Mace. While Clark

testified that the smell of Mace would be strong if it was discharged, he has no first-hand knowledge about any smell in the infirmary. Additionally, according to Clark, nurse Moore heard some sort of commotion, but another nurse told her to "mind her own business." The court concludes that [appellant] presented insufficient evidence to prove that [appellee's] employees heard the attack or smelled the Mace. Finally, the court finds that the fact that the blood crew was called to clean up blood does not prove that [appellee's] employees knew or should have known about the attack when it was occurring in the infirmary.

{¶ 33} On appeal, appellant cites to the investigative report of Clark as evidence that CO Clevenger was aware of the attack in the infirmary. Appellant also contends there was evidence that a nurse heard the assault, but that another nurse told her to mind her own business. As noted above, appellant argued before the trial court that appellee's employees should have been aware of the attack based on the size of the infirmary. The trial court, however, found the record evidence insufficient to determine the size of the infirmary and whether or not other employees would have seen the attack taking place.

{¶ 34} With respect to evidence regarding the dimensions and layout of the infirmary, counsel for appellant relied upon the testimony of Clark, who conducted an investigation of the incident. The transcript indicates that counsel for appellant asked Clark if he could "describe the facilities so that we have some idea of the size and where * * * this took place." (Tr. 57.) Clark responded: "[T]here is a desk. There are some cells back there. Some of them are what you would * * * consider * * * a dry cell separation or a suicide watch cell. And then there's also a general holding cell. And down the one corridor, there is * * * another set of cells that's kind of separate and apart." (Tr. 57-58.) In response to counsel's inquiry as to whether the infirmary was as large as the parole hearing room in which the magistrate was conducting the trial, Clark stated that the infirmary was "larger than this." (Tr. 58.)

{¶ 35} Clark acknowledged "[t]here are some hallways that you wouldn't necessarily be able to see the entirety of the infirmary from." (Tr. 58.) At trial, counsel for appellant asked Clark the following: "[W]ith the door closed, would it be impossible to either smell or hear anything going on in that area?" (Tr. 59.) Clark responded: "I

wouldn't have an opinion on whether or not you would hear anything or not, because I'm not familiar enough with the institution to answer that question." (Tr. 59-60.)

{¶ 36} Clark further testified that he had interviewed the employees present at the infirmary during the incident, and that they all denied hearing or seeing an attack. Specifically, Clark testified that CO Windom claimed not to have seen or heard anything. According to Clark, CO Clevenger related that, at "one point in time, [he] saw Campbell standing up over top of [appellant], and that Garrett was holding him down on the ground, attempting to restrain him, but that he saw nothing unusual about the situation and turned and walked the other way." (Tr. 68.) When Clark asked CO Clevenger why he walked away, the CO "said he thought they had it under control because Campbell was standing." (Tr. 69.) CO Clevenger also told Clark that he did not smell any mace. Clark testified that CO Ransom "stayed consistent through all of the interviews," and that "his only recollection was opening the door for them to take him into the back area of the infirmary, and then claimed to stay out front." (Tr. 70.) CO Ransom told Clark that he did not smell anything.

{¶ 37} Appellant contends that CO Clevenger gave inconsistent statements to the investigator regarding whether an inmate crew was called to the infirmary following the incident to clean up blood. As noted by the trial court, however, such evidence does not address the issue whether employees were aware of the incident at the time of the assault. Further, while appellant points to Clark's testimony that Nurse Edgell was in the area at the time of the incident, Clark's own report states: "There is not definite evidence that she actually witnessed the use of force."

{¶ 38} Upon review, the trial court's finding that it was "unable to determine the size of the infirmary and if employees would have seen the attack taking place" in the back of the facility is not against the weight of the evidence. As noted, there was evidence that the infirmary contained hallways and a set of cells "separate and apart," and the evidence also indicated that COs Campbell and Garrett took appellant to the back of the infirmary to carry out the assault. In interviews with investigators, each of appellee's employees who were present in the infirmary denied observing the attack by the COs, and none of those individuals were called to testify at trial. Based upon the record on appeal, and in light of appellant's burden, we cannot conclude that the trial court erred in finding that

appellant failed to establish, by a preponderance of the evidence, that appellee's employees should have been aware of the assault by COs Garrett and Campbell.

{¶ 39} Accordingly, appellant's first, second, and third assignments of error are without merit and are overruled.

{¶ 40} Under the fourth assignment of error, appellant asserts the trial court erred in failing to join COs Garrett and Campbell as parties. We disagree.

{¶ 41} As noted by the trial court, while an employee "has the right to appeal the court's decision denying the employee immunity, R.C. 2743.02(F) does not require the court to join the employee as a party to the action."[1] In the instant case, the record indicates that appellee provided COs Garrett and Campbell with notice that their immunity was being contested and provided them the opportunity to appear and participate during the hearing before the magistrate. Upon review, we find no error by the trial court.

{¶ 42} Appellant's fourth assignment of error is without merit and is overruled.

{¶ 43} Based upon the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Court of Claims of Ohio is hereby affirmed.

*Judgment affirmed.*

CONNOR and O'GRADY, JJ., concur.

––––––––––––––––––––––––

[1] R.C. 2743.02(F) states in part: "The * * * employee may participate in the immunity determination proceeding before the court of claims to determine whether the * * * employee is entitled to personal immunity under section 9.86 of the Revised Code."